FILED
IN C[LERK'S OFFICE]
17 JUN 12  [AM] 10 21
U.S. DIST[RICT COURT]
DISTR[ICT OF MASS.]

December 7, 2016
Diego Mas Marques
PO Box 560042
Medford, MA 02156

**Honorable Judge Mark L. Wolf**
1 Courthouse Way
Boston, MA 02210

09-CR-10304

Honorable Judge Wolf,

This letter is in reference to your legal decision, dated September 22, 2015. I had written a Motion to you on January 18, 2013 to basically request the Sealing of this foreign conviction from Spain. I initiated this because in January of 2013 I was stopped by a Medford State Trooper who told me the scanner on his vehicle had scanned my plate and an FBI Alert had come up. I had no idea what he was talking about but after he ran my license he asked me to step out of my car and walk over to the guardrail. The Trooper told me he had to put the handcuffs on me for security reasons? I was then placed in the back of this Troopers vehicle for over 20 minutes, while he was talking to someone on his radio. Then this Trooper explained to me that I was all set and could go. When I stepped out of the vehicle this State Trooper then told me that his name was Trooper Pek from the Massachusetts State Police Barracks.

Shortly after this stop by State Trooper Pek I wrote a one page Motion requesting this supposed FBI alert and the situation from Spain to be sealed. At that point I had not even seen my NCIC record until I requested this record in 2015. I was shocked to see that the charges were willful homicide and burglary.

I had the International Treaty Hearing before Judge William Callahan in February 2006 and I mentioned to him on the record that the translation of these charges were not correct and if it stays this way then I did not want to transfer back to the US. Judge Callahan explained to me that this will be taken care of once I arrived back in the US. Absolutely nothing has been updated regarding the proper translation of these charges from Spain. I even had a conference call with Judge Callahan on the record several months ago regarding this matter. It seems that nobody knows exactly who was or is responsible for entering this erroneous translation of the Spanish charges into the NCIC.

For two years now I have been making every attempt to have these charges updated in the NCIC records, with the correct translations. When I contacted the NCIC I was told I had to contact the Southern District of New York Probation Office. When I contacted the Southern District of New York Probation Office I was told that they already had the charges on paper and requested that I contact another Federal agency. I contacted the US Parole Commission and they requested my documents from Archives in Ohio and I don't know what they were doing for about a year but at the end told me that they could not do anything and sent the file back to archives? I contacted various Federal agencies regarding this matter and always appear to get the same answer, "Its not over here that you need to contact, you need to contact another agency" and when I do that the other agency basically gives the same answer. I have been on a wild goose chase with this for two years now and nobody seems to know how to rectify the incorrect translated charges in the NCIC.

In Spain the charge was Article 138 homicidio, which is manslaughter and not willful homicide. The other two charges are Article 202.1 allanamiento de morada, which is breaking and entering and not burglary. The charges entered into the NCIC were done without any attention to detail. The actual Spanish Penal Code is online from the Ministerio de Justicia and this cleary shows exactly what the these charges are, manslaughter and breaking and entering and not willful homicide and burglary.

Spain allows for expungement of criminal charges and not just sealing. Spain expunges criminal records from their Justice database and then one has to go to all three police forces, Guardia Civil, Policia Nacional and the Policia Local. I was sentenced under the Spanish Penal Code of 1996 and for the charge of Article 138 manslaughter the expungement takes place after 5 years of being released.

So, last October 2015, before even knowing that a legal decision had come out on my January 2013 Motion, I had sent out over 15 pounds of documentation to Spain's Justice Department in Madrid. Spain appears to have a better social reinsertion program for ex-offenders, as criminal charges in Spain are not simply sealed but literally expunged from their databases to afford ex-offenders a second charge at social reinsertion.

I was at a job interview on October 9, 2015 and the Recruiter kept asking me about a criminal record and stated that I do not have a criminal record, as a foreign conviction is not considered a criminal conviction in the US. I have accompanied the 4 page State Department document that clearly explains, that a foreign conviction is not considered a criminal record or conviction in the US, as any criminal case from outside the US is not considered a criminal case under US Constitutional guarantees in the USA.

On October 11, 2015 I looked my name up in Google and was shocked to see that a legal decision had been done, without any notification to me and I found out about this online. After this I have been to a couple of more job interviews and have not been able to get a job.

This September 22, 2015 legal decision has mistakes. I won't go through all the mistakes in this legal decision but here are some of them: Article 183 instead of Article 138, that I moved to Woburn when I moved from New York to Medford,I arrived to the US in 2006 and not 2005, that I was convicted in Spain on July 17, 2000, when in fact that was the date the jury trial started and not the conviction date. The actual conviction date was at the end of 2002 after I exhausted my 4 appeals. Also, I filed this Motion as "Pro-Se" and I am not an Attorney, I did not use any legal citations but this legal decision was full of legal citations, which some were heavy hitters to respond to a person who is not even an Attorney. I made a mistake filing this Motion as defendant, when it should have been as a Plaintiff. Again, I am not an Attorney and never pretended to be an Attorney. I simply wrote a simple one page Motion in which I did not use one single legal citation.

Now there have been cases of expungements in Federal Courts, especially for reasons of employment, see United States v. Doe, 935 F. Supp. 478 (S.D.N.Y. 1996) or United States v. Schnitzer, 567 F. 2d 536 (2d. Cir. 1977) (court has equitable authority to expunge). One must remember that this is a foreign conviction and not a US conviction, so I don't even believe that this type of case has even been brought before, as one cannot compare a denial of expungement or sealing regarding of a US case, which was tried in the USA with a foreign case that was tried in a foreign country such as Spain, without US Constitutional

guarantees. The legal citations utilized in the September 22, 2015 decision all have to do with cases that were tried in US courts and not a foreign court.

This September 22, 2015 legal decision was somehow picked up by a third party website called leagle.com and posted at the top of the page on Google. I contacted the supposed owner a Shakeel Mustafa who told me that he wanted money and that his business model does not really allow for any URL removal? When I called him back at this Palo Alto, California number, it was disconnected and next thing I noticed is that this legal decision was being boosted on to just about every single major Search Engine out there. I found a new number for this Shakeel Mustafa in Round Rock, Texas and he told me that he was the owner of leagle,Inc and not leagle.com and he proceeded to tell me, "I'm going to fucking kill you" and hanged up. This leagle.com aka leagle,Inc, which apparently one in the same even has a fake Twitter account showing their location as Washington, D.C. but nobody there has any record of this website or company. There is information online at ICANN regarding leagle.com but it shows the owner as a Donald Johnson in Little Rock, Arkansas. This is all made up but the owner of leagle.com

The US does not have a lot of protections when it comes to citizens privacy being abused for profit, especially by third party websites operating from outside the US where the owners of these websites use our freedoms and laws against us and have a total disregard for US Citizens. These website owners only care about one thing, "money" and nothing else and they have a total disregard for Americans and the data that they upload through most likely fraudulent means and then download on to their monetized websites.

I have have already been accused, tried and sentenced and have done my time. Please keep an open mind regarding this situation and the effects that is having on my life. One must remember that the Spanish Justice system does not do things in the same way as in the US and I can tell you with certainty that there is major corruption in the Spanish judicial system.

Your Honor, I am respectfully requesting that the URL regarding the September 22, 2016 posted by leagle.com, that I have accompanied with this letter be removed from the world wide web, as it has and is destroying my career and reputation. At this point with this URL on the web I cannot even find a job, employers look up people on the web before hiring. Also, I am being harassed and threatened online and this situation is causing me serious emotional and financial harm. I filed a complaint with the local Police Department.

I appreciate your time and consideration in this matter.

Sincerely,

Diego Mas Marques



**CONSULATE GENERAL OF THE
UNITED STATES OF AMERICA**

Barcelona

7 de octubre de 2005

Mr. Diego Mas Marques
Apartado de Correos 1075
07120 Palma de Mallorca

Dear Mr. Mas Marques:

Further to our letter dated September 26, the International Transfer Unit has requested that this Consulate General forward you the following documents in order to complete your transfer application:

- **Form 1:**
  **International Prisoner Transfer Notification and Acknowledgement Form** *(Please sign this form)*

- **Form 2:**
  **Prisoner Transfer Application Questionnaire**
  *(Please complete this form)*

- **Form 3: Information sheet on Prisoner Transfer Information for Americans Incarcerated Abroad**
  *(For your information only)*

- **Form 4: Information sheet on International Prisoner Transfer-Prior Record**
  *(For your information only)*

As soon as you have the above documents completed, please send them to our office together with your birth certificate and the new signed Privacy Act Waiver form, authorizing us to release the information requested by the Department of Justice, International Transfer Unit.

Sincerely,

David J. Mico
U.S. Consul

**U.S. Department of Justice**

10th & Constitution Avenue, N.W.
Criminal Division
Office of Enforcement Operations

International Prisoner Transfer Unit
John C. Keeney Building, 12th Floor
Washington, D.C. 20530

## Prisoner Transfer Information for Americans Incarcerated Abroad

When an American is arrested abroad the arresting country is obligated to notify United States consular officials. Once the American Embassy or Consulate is notified, a consular official will visit and interview the prisoner. However, before the American consular official can provide consular services he must determine whether the prisoner is a United States citizen. To make this determination, the prisoner needs to provide strong evidence of citizenship such as a passport or an original birth certificate. If convinced that the prisoner is an American citizen, the consular official will prepare and send an arrest cable that states how the Embassy was notified of the arrest, whether the prisoner has consented to the release of information to others and information about the nature of the offense. In addition, the consular official will provide the prisoner with various types of information including the availability of the international prisoner transfer program.

The International Prisoner Transfer program, which is authorized by federal law and international treaties, is administered by the United States Department of Justice. An American prisoner is not eligible for transfer to the United States until he has been sentenced by the foreign country. Once sentencing occurs the application process can be initiated. Whether the prisoner or the American Embassy makes the formal transfer request to the foreign country will depend upon the terms of the particular treaty governing the transfer.

In addition to the requirement that the prisoner be sentenced, there are other general requirements that must be satisfied before a transfer can occur. The judgment and sentence must be final, which means that there can be no pending appeals or collateral attacks. There also must be sufficient time remaining on the sentence for an application to be processed. Normally this period is 6 months but sometimes it is a year. Some foreign governments require the prisoner to pay any fines or restitution that are imposed as part of the sentence before transfer can occur and sometimes even before the approval decision is made. Other treaties prohibit the transfer of certain types of offenses such as immigration, military and political offenses.

A prisoner who is interested in transferring should contact the Defender Services Division of the Administrative Office of the U.S. Courts to obtain advice as to whether a transfer would be an appropriate option for the prisoner. Some prisoners decide not to apply for transfer after consulting with a federal public defender ("FPD") and learning that they will spend less time in custody if they remain in the foreign country than if they transfer to the United States and have their sentence administered according to United States sentencing provisions.

If the prisoner has questions concerning how his sentence will be administered in the

package will include the foreign sentencing documents, a summary and translation of the offense behavior and prisoner information, a copy of the travel document (proof of citizenship) and information regarding the prisoner classification and conduct. Once these documents are assembled they will be forwarded to the International Prisoner Transfer Unit ("IPTU") of the Criminal Division of the Department of Justice. The IPTU will review the application and decide whether to approve the request. If both the IPTU and the foreign government approve the request, the IPTU will make arrangements for a consent verification hearing. At the consent verification hearing which is presided over by a federal magistrate and where the prisoner is represented by a FPD, a determination is made whether the prisoner understands the outcome of the transfer and whether he consents to the transfer. If the prisoner consents to the transfer, arrangements are made with the Federal Bureau of Prisons and the foreign government to transport him back to the United States where he will be incarcerated in a federal prison.

When the day for the transfer arrives, the prisoner should be prepared. He should have disposed of all of his belongings except for a small amount of personal property, e.g. glasses, medications, bibles, cash (preferably in a money order denominated in dollars), family photos etc. Other than a wedding band, no jewelry is permitted including watches, earrings and necklaces. Hair bands, clasps and braids will also be prohibited. Prohibited property and additional personal property like clothing, books and appliances should be mailed to the prisoner's home before the transfer. Since the prisoner will likely wear leg irons for the transfer, a pair of socks for the day of the transfer is advisable. The prisoner will be subject to a full body search before transfer.

Once the prisoner is returned to the United States, the foreign sentencing documents will be copied and given to a United States Probation Officer. The probation officer will review these documents and then visit the prisoner to collect background information. After a brief investigation, the probation officer will prepare a "post sentence investigation report." This report, which takes about 30-60 days to prepare, will include a recommendation as to the period of confinement and period of supervised release that would apply after considering the relevant United States Sentencing Guidelines. Thereafter, the United States Parole Commission will review the case and decide the length of time the prisoner should remain in prison and the period of supervised release that will apply when the prisoner is released from prison.

Family members and representatives can obtain additional information from two useful web sites. The first is from the Department of State site at "http://travel.state.gov/transfer.html" and the second is the Department of Justice site at "www.usdoj.gov/criminal/oeo/". Prisoners who are applying for transfer may be represented by an attorney but need not be. The overwhelming majority of applicants to the prisoner transfer program are not represented by an attorney. Because of limitations imposed by the Privacy Act, 5 U.S.C. § 552a, the Department of Justice cannot provide information about individual prisoner transfer cases without a signed waiver of confidentiality from the prisoner. This law applies whether the inquiring party is the prisoner's Congressman or family member. A sample Privacy Act waiver form can be found at the Department of Justice website.

BOOK II

Felonies and their penalties

TITLE I

On unlawful killing and its forms

Article 138

Whoever kills another shall convicted of manslaughter, punishable with a sentence of imprisonment from ten to fifteen years.

Article 139

Whoever kills another when any of the following circumstances concur shall be convicted of murder and punished with a sentence of imprisonment from fifteen to twenty years:

1. With premeditation;

2. For a price, reward or promise;

3. With wanton cruelty, deliberately and inhumanely increasing the victim's suffering.

Article 140

When more than one of the circumstances foreseen in the preceding Article concur in a murder, a sentence of imprisonment shall be from twenty to twenty-five years.

Article 141

Provocation, conspiracy and solicitation to commit the offences foreseen in the preceding three Articles shall be punished with the penalty lower by one or two degrees to that stated as appropriate in the preceding Articles.

Article 142

1. Whoever causes the death of another by serious negligence shall be convicted of manslaughter and punished with a sentence of imprisonment of one to four years.

2. When the manslaughter is committed using a motor vehicle, a moped or a firearm, the punishment shall also, and respectively, include deprivation of the right to drive motor vehicles and mopeds or deprivation of the right to own and carry weapons from one to six years.

3. When the manslaughter is committed due to professional negligence, the punishment of special barring from exercise of the profession, trade or cargo shall also be imposed, for a period of three to six years.

Article 143

1. Whoever induces another to suicide shall be punished with a sentence of imprisonment from four to eight years.

Article 198

The authority or public officer who, outside the cases permitted by Law, without there being a legal cause due to an offence having being committed, and availing himself of his office, acts in any of the manners described in the preceding Article, shall be punished with the penalties respectively foreseen therein, in the upper half and also with that of absolute barring for a term from six to twelve years.

Article 199

1. Whoever discloses secrets of others that he obtains knowledge whereof through his trade or labour relations, shall be punished with a sentence of imprisonment from one to three years and a fine from six to twelve months.

2. Professionals who, in breach of their obligation of secrecy or reserve, reveal secrets of another person, shall be punished with a sentence of imprisonment of one to four years, a fine of twelve to twenty-four months and special barring from that profession for a term from two to six years.

Article 200

The terms set forth this Chapter shall be applicable to whoever, discloses, reveals or communicates reserved data of legal persons without the consent of their representatives, except for what is set forth in other provisions of this Code.

Article 201

1. Prosecution of offences foreseen in this Chapter requires a report by the victim or his legal representative. When the former is a minor, incapacitated or handicapped person, it may also be reported by the Public Prosecutor.

2. The report required in the preceding Section shall not be necessary to prosecute the acts described in Article 198 of this Code nor when the offence committed affects general interests or persons at large.

3. Forgiveness by the victim or his legal representative, as appropriate, extinguishes the penal action without prejudice to what is set forth in Paragraph Two of Sub-Section 5 of Section 1 of Article 130.

## CHAPTER II

**On trespassing a dwelling, the registered address of legal persons and establishments open to the public**

Article 202

1. The individual who, without being resident therein, enters the dwelling of another, or were to remain therein against the will of its dweller, shall be punished with a sentence of imprisonment of six months to two years.

2. Should the act be perpetrated with violence or intimidation, the punishment shall be imprisonment from one to four years and a fine from six to twelve months.

Article 203

1. Whoever enters the domicile of a public or private legal person, professional firm or office, a trading establishment or premises open the public after opening hours against the will of its owner shall be punished with imprisonment of six months to one year and a fine from six to ten months.

This is Google's cache of http://www.leagle.com/decision/In%20FDCO%2020150924A28/U.S.%20v.%20MasMARQUES. It is a snapshot of the page as it appeared on Nov 27, 2016 16:59:06 GMT.
The current page could have changed in the meantime. Learn more

Full version   Text-only version   View source

Tip: To quickly find your search term on this page, press **Ctrl+F** or **⌘-F** (Mac) and use the find bar.



  

**LAWYER LOGIN**

Home / Browse Decisions / U.S. v. MasMARQUES

# U.S. v. MasMARQUES

No. 09-10304-MLW.

Email | Print | Comments (0)

*UNITED STATES OF AMERICA v. DIEGO MASMARQUES, Defendant.*

United States District Court, D. Massachusetts.

September 22, 2015.

View Case    Cited Cases    Citing Case

**MEMORANDUM AND ORDER**

**MARK L. WOLF,** *District Judge.*

Defendant Diego MasMarques has filed a Motion to Seal, asking the court to seal the record of this case



  

**LAWYER LOGIN**

Home / Browse Decisions / U.S. v. MasMARQUES

# U.S. v. MasMARQUES

No. 09-10304-MLW.

Email | Print | Comments (2)

*UNITED STATES OF AMERICA v. DIEGO MASMARQUES, Defendant.*

United States District Court, D. Massachusetts.

September 22, 2015.

View Case   Cited Cases   Citing Case

## MEMORANDUM AND ORDER

**MARK L. WOLF**, *District Judge.*

Defendant Diego MasMarques has filed a Motion to Seal, asking the court to seal the record of this case on the PACER system and to remove the record from the Federal Bureau of Investigation's ("FBI") National Criminal Information Center ("NCIC") database (the "Motion"). The Motion is being denied for the reasons explained below.

## I. BACKGROUND

On July 17, 2000, MasMarques, who is an American citizen, was convicted of two counts of burglary and one count of willful homicide in Spain. The Spanish court sentenced him to one year in prison on the first burglary count, two years in prison on the second burglary count, and twelve years in prison on the homicide count. In 2005, pursuant to a Transfer Treaty, he was transferred to the United States to serve the remainder of his sentence.

Prior to his transfer to the United States, MasMarques signed a form consenting to serve the remainder of his sentence according to the laws of the United States. By signing the form, he agreed that his "conviction or sentence can only be modified or set aside through appropriate proceedings brought by me or on my behalf in Spain." See Feb. 13, 2006 Verification of Consent to Transfer (Docket No. 1-4).

MasMarques's case was initially assigned to the Eastern District of Wisconsin for performance of the verification proceedings required by 18 U.S.C. §4108. On August 20, 2008, MasMarques was released to a three-year term of supervised release in the Southern District of New York. On June 2, 2009, with the permission of the Probation Office, MasMarques moved to Woburn, Massachusetts. As a result, his case was transferred to this court for supervision during the remainder of his period of supervised release. See 18 U.S.C. §4106A(b)(3).

On January 18, 2013, MasMarques, acting pro se, filed a motion requesting that the court seal the record of his conviction in Spain. In addition, he requests that the court remove a negative "alert" that appears in the FBI's NCIC database. He claims that the availability of his criminal record has harmed his ability to find a job. He maintains that allowing this criminal record to be publicly accessible violates his rights under the Double Jeopardy Clause.

## II. DISCUSSION

MasMarques's Motion to Seal presents four issues: (1) whether public availability of his criminal record constitutes a second punishment in violation of the Double Jeopardy Clause of the Fifth Amendment; (2) whether the court should seal the record of his conviction; (3) whether the court has authority to order the removal of the negative "alert" based on his case that appears in the FBI's NCIC database; and (4) whether the court has authority to expunge MasMarques's criminal record.

MasMarques is proceeding pro se. Therefore, his motion will be construed liberally. See Erickson v. Pardus, 551 U.S. 89, 94 (2007). Nevertheless, there is no legal basis to grant the relief that he requests. Therefore, his Motion is being denied.

### A. Double Jeopardy

The Double Jeopardy Clause "safeguards an individual against (1) a second prosecution for the same offense, following an acquittal; (2) a second prosecution for the same offense, following a conviction; and (3) multiple punishments for the same offense." United States v. Stoller, 78 F.3d 710, 714 (1st Cir. 1996) (quoting United States v. Rivera-Martinez, 931 F.3d 148, 152 (1st Cir.), cert. denied, 502 U.S. 862 (1991)). "The Clause protects only against the imposition of multiple criminal punishments for the same offense . . . and then only when such occurs in successive proceedings." Hudson v. United States, 522 U.S. 93, 99 (1997) (emphasis in original). In determining whether a government action is "punishment" for purposes of the Double Jeopardy Clause, courts examine the totality of the circumstances to determine whether its objectives or effects are "punitive" in nature. See Stoller, 78 F.3d at 721.

The public availability of the records of MasMarques's conviction under the PACER, CORI, and NCIS

system is not a "punishment" in violation of the Double Jeopardy Clause. Many courts have recognized that "[t]he dissemination of accurate public record information concerning an individual's past criminal activities holds "the potential for substantial negative consequences." E.B. v. Verniero, 119 F.3d 1077, 1099 (3d Cir. 1997). "Nevertheless, our laws' insistence that information regarding criminal proceedings be publicly disseminated is not intended as punishment and has never been regarded as such." Id. at 1100. The purpose of these systems is "regulatory," and they, therefore, are "not punishment even though it may bear harshly on one affected." Doe v. Pataki, 120 F.3d 1263, 1279 (2d Cir. 1997) (quoting Flemming v. Nestor, 363 U.S. 603, 613 (1960). Furthermore, the negative effects of publicly disseminating criminal records do not "implicate any interest of fundamental constitutional magnitude." See Verniero, 119 F.3d at 1103. Therefore, the availability of the PACER records, the NCIC alerts, and the resulting negative effects do not constitute a second punishment in violation of the Double Jeopardy Clause.

### B. Sealing MasMarques's Court Records

In the United States, there is a common law presumption of public access to judicial records. See Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978); United States v. Kravetz, 706 F.3d 47, 62 (1st Cir. 2013). This presumption "stems from the premise that public monitoring of the judicial system fosters the important values of `quality, honesty and respect for our legal system.'" Siedle v. Putnam Investments, Inc., 147 F.3d 7, 9-10 (1st Cir. 1998). Furthermore, Congress has recognized a "compelling public need" to keep criminal records publicly available. United States v. Schnitzer, 567 F.2d 536, 539 (2d Cir. 1977). When evaluating a motion to seal a court record, the court "carefully balances the competing interests that are at stake in the particular case." Siedle, 147 F.3d at 10.

MasMarques contends that it is unfair to allow the record of his case to be publicly accessible through the court's PACER system because public availability of the record has made it difficult for him to find a job. If courts were to allow the stigma resulting from the public record of a case to outweigh the public right of access, then virtually all criminal records would be sealed. The balance might lean more in MasMarques's favor if he had been acquitted or exonerated of the charges in Spain. See Diamond v. United States, 649 F.2d 496, 499 (7th Cir. 1981). However, the presumptive public right of access to court records is not outweighed solely because the record has an adverse effect on the defendant's livelihood, as such rule would vitiate the presumptive public right of access. Indeed, "courts must be reluctant to substitute their judgment for that of employers, legislators, and others in whom the discretion to give second chances is more properly vested." United States v. Barrow, 06-Cr-1086(JFK), 2014 WL 2011689, at *2. Consequently, the court is denying MasMarques's request to seal the record of this case.

### C. Removing the "Alert" from the NCIC Database

28 U.S.C. §534 directs the Attorney General to maintain a criminal records database. MasMarques complains that his criminal record is accessible in this database. However, courts are without authority to order removal of a criminal record from the NCIC database. See Carter v. United States, 431 Fed. Appx. 104, 105-06 (3d Cir. 2011); United States v. Lucido, 612 F.3d 871, 875 (6th Cir. 2010). Therefore, the court must deny MasMarques's request.

### D. Expunging MasMarques's Criminal Record

MasMarques also appears to request that the court expunge the American court records of his convictions in Spain. However, federal courts lack subject matter jurisdiction to expunge criminal records based solely on "equitable reasons," meaning "grounds that rely only on notions of fairness and are entirely divorced from legal considerations." United States v. Coloian, 480 F.3d 47, 52 (1st Cir. 2009). MasMarques

provides no legal basis to expunge his record. The court does not have jurisdiction to expunge his record on these grounds. See id.

## III. ORDER

In view of the foregoing, it is hereby ORDERED that Defendant's Motion to Seal (Docket No. 4) is DENIED.

### Comment

Your Name

Your Email

Comments

Submit

1000 Characters Remaining

Leagle.com reserves the right to edit or remove comments but is under no obligation to do so, or to explain individual moderation decisions.

**Maria** on Sat Nov 05 2016 commented:
Diego Mas Marques has harrassed me and threatened me in the last days. Very good that the appeal has been denied so others know that Diego is a criminal.

Reply | Flag as Offensive

**Joshua** on Sat Nov 26 2016 commented:
Maria: The FBI will investigate this fake and harassing comment and you will be criminally charged with harassment, threats and defamation. You will be found with your IP address no matter from where you sent this made up comment.

Reply | Flag as Offensive

**Featured Lawyers**

    



Mary Conner Pool
Bond, Botes, Shinn & Donaldson, P.C.
Montgomery
Alabama

